STATE OF CONNECTICUT *v.* WILLIAM EASTWOOD
(AC 23907)

Foti, Dranginis and McLachlan, Js.

Argued March 22—officially released June 22, 2004

*David G. Toro*, for the appellant (defendant).

*Toni M. Smith-Rosario*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *John P. Doyle, Jr.*, assistant state's attorney, for the appellee (state).

### Opinion

FOTI, J. The defendant, William Eastwood, appeals from the judgment of conviction, following a jury trial, of three counts of attempt to commit kidnapping in the second degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-94 (a), three counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (a) (1), as amended by Public Acts 2000, No. 00-207, § 6, and one count of interfering with an officer in violation of General Statutes § 53a-167a.[1] On appeal, the defendant claims that the court improperly (1) denied his motion to suppress items that police seized from his van, (2) admitted these items into evidence and (3) denied his motion for a judgment of acquittal with regard to the risk of injury counts. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. During the afternoon hours of October 16, 2000, the defendant drove in his van to Liberty Street in New Haven. He parked his van near a multifamily house where ten year old J, eleven year old R and twelve year old N, who are brothers, resided with their family. In the early evening hours, after the boys had returned home from school, R and N walked to a nearby market

---

[1] The court sentenced the defendant to a total effective sentence of nine years incarceration to be followed by fifteen years of special parole.

to purchase snacks. J received a quarter from his uncle and began walking toward the market to join his brothers. J was not wearing a shirt.

The defendant, who was sitting in the driver's seat of his van with the driver's window rolled down, observed J walking alone toward the market. The defendant called to J, saying, "little boy . . . come here, come here." J declined. The defendant then said to J, "come in this van," and indicated that he wanted to take him to Madison. When J again refused to approach, the defendant said, "when I take you, you're not going to tell your parents." The defendant told J, "don't make me come out of this van and grab you and kill you; you ain't gonna see your parents again." The defendant then opened the driver's door of his van and stepped out. The defendant threatened to kill J if he did not get into the van. J smelled alcohol on the defendant's breath, observed the defendant drinking from a square shaped bottle and observed through a window a mattress in the back of the van.

Frightened by the defendant, J ran to the market and told his brothers about his encounter with the defendant. Shortly thereafter, the three brothers left the market together. They soon encountered the defendant, who called to them. The defendant had spoken with R shortly before, asking him to go with him in his van. The defendant now asked the boys, as a group, to accompany him to Madison. J left the scene to get his uncle, who lived in his house. The defendant again asked R and N to get into the van so he could "take them somewhere." The defendant threatened to kill R and N if they did not get into the van. The defendant told R that he was not a stranger and that he was not dangerous. R refused to get into the van, telling the defendant, among other things, to leave him alone and that he was a stranger.

J summoned his uncle, telling him that "there is a guy that wants to take me to Madison; if I don't get in the car, he is going to kill me." The victims' uncle immediately walked to the van and asked the defendant what he wanted. The uncle had never met the defendant before and believed that the defendant was intoxicated. The defendant asked the uncle if he could take the boys to Madison. The uncle strongly refused, instructed his nephews to go back inside their house and dialed 911 on his cordless telephone.

The defendant, watching the boys' home, remained in his van until Gregory Catania, a New Haven police officer, arrived. The defendant disobeyed Catania's commands to exit the van. Catania opened the driver's door of the van, pulled the defendant out of the van and attempted to handcuff the defendant. The defendant resisted. A second police officer, Rosealee Reid, arrived and assisted Catania in handcuffing the defendant and placing him in the back of Catania's police cruiser. Catania placed the defendant under arrest. The defendant brought this appeal after his trial and conviction. Additional facts germane to the defendant's claims will be set forth as necessary.

I

The defendant first claims that the court improperly denied his motion to suppress items that police found in his van. We disagree.

The record reflects that police filed an application for a warrant to search the defendant's van, which was being stored at a police garage following the defendant's October 16, 2000 arrest. Peter Moller, a detective with the New Haven police department, and David Fitzgerald, an officer with the New Haven police department, submitted the application as well as their affidavit in support of the warrant application. The application was for "any and all weapons and firearms including pistols,

rifles, revolvers, shotguns, hatchets, axes, knives, cutting instruments and cutting tools, blunt force instruments, projectiles, ammunition, bullet casings, computer systems . . . that may be used to 'access' . . . process or store data, cameras, video equipment, 'lures' i.e. toys, books, computer games, other items that would attract a child, restraints, video tapes, film, photographs or other images of a sexual nature" within the van.

In their affidavit, Moller and Fitzgerald averred, on the basis of their personal knowledge, personal observations, information received from other police officers, police reports and from statements given by prudent and credible witnesses, the following facts. On October 16, 2000, Catania and Reid responded to the 911 call from the victims' uncle concerning a man outside of his home who threatened to kill his nephews if they did not accompany him. The officers found the defendant sitting in his van, but the defendant refused to comply with instructions to exit the van. The officers physically removed the defendant, who appeared to be intoxicated, from the van. The officers conducted a brief search of the van for weapons, but did not find any. Catania, however, noticed a "silver police type badge" on the van's dashboard.

Moller and Fitzgerald further averred that Catania had spoken with the uncle, who related that J had run to his house and told him that " 'there's a guy who wants to kill me. There's a guy that wants to kill me if I don't get into his car.' " The uncle went outside and found the defendant sitting in the driver's seat of his van, talking to R and N. The defendant asked the uncle if he could take the boys to Madison. The uncle refused and called 911. Later that night, detectives from the New Haven police department interviewed J, R and N. Ten year old J recounted that the defendant had called to him, asked him to get into the van and said, " 'If you

don't come in, I'm gonna kill you.' " At that time, the defendant opened the driver's door and moved his feet outside of the van. R and N recounted their similar experience, how the defendant had called to them and told them that he wanted to take them somewhere. R and N informed the detectives that, when they refused, the defendant appeared to become angry and told them, " 'come here or I'll kill you.' "

Moller and Fitzgerald further averred that following the defendant's arrest, they conducted a criminal background check. They discovered that, in October, 1989, Madison police had arrested the defendant for risk of injury to a child. The arrest warrant in that case disclosed that the defendant's brother-in-law reported to police that the defendant had engaged in activities with and made comments of a sexual nature to his thirteen year old son, the defendant's nephew. When police officers interviewed the defendant concerning these allegations, the defendant "freely admitted" that these events had occurred and that he desired " 'younger people.' "

The detectives averred that they spoke with Catania regarding Catania's "brief search for weapons" in the defendant's van immediately following the arrest. Catania recalled observing "a bed at the back of the vehicle, [a] computer printer, a black case containing what appeared to be a laptop type computer, a camera tri-pod stand, a bright camera light [and] two filing cabinets, along with clothing and various other [personal] items." Following the arrest, police towed the defendant's van to the police garage.

Moller and Fitzgerald finally averred that, on the basis of their training and experience as members of their department's sexual assault and bias crime unit, "individuals that attempt to lure young children off of the street and into their vehicle do so in order to assault,

rob, kidnap or sexually molest the child. That persons involved in luring children into their vehicles used different methods such as 'Lures', i.e. toys, books, candy, computer games, or other things that would attract a child. These individuals will also deceive children, gaining their trust by pretending to be . . . Police Officers, Fire Fighters [or] other trusted individuals. That in some instances, these individuals have been known to use or threaten to use physical violence against children to force them to comply with their demands." On the basis of their averments, the detectives manifested their belief that probable cause existed that evidence relating to the defendant's charged crimes was contained within his van.

On October 20, 2000, the court, *Alexander, J.*, issued the warrant and, on October 23, 2000, police executed the warrant. Prior to trial, the defendant filed a motion to suppress all evidence seized during the search and any testimony regarding such evidence. Evidence seized by police during their search of the van included a portable lamp with a 250 watt bulb, a disposable 35mm camera that was still in its packaging, many sheets of stickers, a badge engraved with the title, "Security Guard," a pair of size eight underwear, approximately seventy-one photographs depicting boys, six photographs depicting naked boys and thirty-four pages of typewritten material authored by the defendant. At the hearing on the motion, the defendant claimed that probable cause did not exist in support of the warrant and that any evidence seized during the search, therefore, was inadmissible as fruit of an illegal search. The court denied the motion to suppress. The defendant now claims that the court's ruling was improper because the information contained in the application was insufficient to support a finding of probable cause.

"Whether the court properly found that the facts submitted were enough to support a finding of probable

cause is a question of law and is subject to plenary review on appeal." *State* v. *Greene,* 81 Conn. App. 492, 496, 839 A.2d 1284, cert. denied, 268 Conn. 923, 848 A.2d 472 (2004). "The law regarding probable cause and the standards for upholding the issuance of a search warrant are well established. We uphold the validity of [a search] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the [issuing judge's] conclusion that probable cause existed. . . . [T]he [issuing judge] is entitled to draw reasonable inferences from the facts presented. When [an issuing judge] has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the [issuing judge]. Whe[n] the circumstances for finding probable cause are detailed, whe[n] a substantial basis for crediting the source of information is apparent, and when [an issuing judge] has in fact found probable cause, the reviewing court should not invalidate the warrant by application of rigid analytical categories. . . .

"Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . In determining the existence of probable cause to search, the issuing [judge] assesses all of the information set forth in the warrant affidavit and should make a practical, nontechnical decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . We view the information in the affidavit in the light most favorable to upholding the [issuing judge's]

determination of probable cause. . . . In a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the [issuing judge's] determination. . . . Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." (Internal quotation marks omitted.) *State* v. *Buddhu*, 264 Conn. 449, 459–60, 825 A.2d 48 (2003), cert. denied, 541 U.S. 1030, 124 S. Ct. 2106, 158 L. Ed. 2d 712 (2004).

The defendant argues in his brief: "[T]here was no probable cause to believe that the items enumerated by the officers [in the warrant application] were associated with criminal activity, and there was no probable cause to believe that the items named would be found in the place to be searched. The causal connection between the threats made [by the defendant] and the items believed to be in the defendant's possession does not exist. The facts, as explained by the officers, do little to reasonably persuade an impartial and reasonable mind that probable cause exists. The facts, rather, give way to suspicion and conjecture."

First, we conclude that probable cause existed with respect to objects such as weapons, firearms or restraints. The affidavit contained allegations that the defendant, having asked the three boys to accompany him in his van, threatened to "kill" each of them if they did not acquiesce to his request. It was not unreasonable to conclude that, at the time that the defendant made these threats, he possessed a weapon or firearm that would have enabled him to carry them out. Such evidence would certainly have been connected to the defendant's criminal activity, would have assisted in the defendant's conviction and would have been found in the place to be searched.

Second, we conclude that probable cause existed with regard to computer systems, cameras, video equipment, videotapes, film and photographs or other images of a sexual nature. The affidavit contained allegations that the defendant had asked three boys, aged ten, eleven and twelve, to get into his van and to accompany him to another location. The boys did not know the defendant, and when the defendant became upset after the boys refused to accompany him, he threatened to kill them. The affiants further alleged facts relating to the defendant's prior arrest in Madison, where he engaged in conduct of a sexual nature with a thirteen year old boy. When questioned concerning that behavior, he "freely admitted" his desire for " 'younger people.' " Also, the affidavit contained facts related to Catania's brief search of the defendant's van following the arrest. Catania described having observed a bed, a computer printer, a laptop computer, a camera, a camera light and a filing cabinet.

There is probable cause that these items were related to criminal activity and would have assisted in the defendant's conviction. The facts alleged were that the defendant wanted the boys to get into his van and wanted to take them somewhere away from their home. The facts alleged in the affidavit, including the circumstances surrounding the defendant's prior arrest, created a reasonable suspicion that there was a sexual motive underlying the defendant's unusual conduct. The affidavit also related Catania's observation of a bed, computer and camera equipment in the back of the van. On the basis of these facts, probable cause existed that these items would have provided evidence of the defendant's motive and were connected to the alleged criminal activity for which the defendant was arrested.

Third, we conclude that probable cause existed with regard to lures, which include toys, books, computer

games or other "things that would attract a child. . . ." On the basis of the facts previously detailed, it was reasonable to believe that that this type of evidence would have been connected to criminal activity or would have assisted in the defendant's conviction. The facts demonstrate that the defendant's objective was getting the boys into his van. It is not dispositive, as the defendant suggests it is, that there was no allegation that the defendant actually used any such items. Instead, it is logical to infer from the facts presented that the defendant was sexually attracted to young boys. The existence of items that would logically attract children, such as those listed, certainly would have corroborated the victims' allegations. Such items would have been further evidence that reflected the defendant's criminal scheme. Further, because the defendant attempted to get these boys to go into his van, there was probable cause to believe that such items would be located in the van.

## II

The defendant next claims that the court improperly admitted into evidence the items seized from his van. We disagree.

At trial, the state offered these items "in regards to [the defendant's] motive, in regards to his intent, and in regards to his state of mind" at the time of the incident. The defendant objected on the grounds that these items did not have any probative value, that he did not use any of these items in his interaction with the three boys and that the prejudicial value of certain of these items was great. The court admitted the items into evidence, noting that although some of the items were "extremely prejudicial," such prejudice was outweighed by the items' high probative value with regard to the defendant's motive, intent and state of mind.[2]

_____

[2] The defendant claims on appeal that the court admitted all of the items seized from his van as evidence of prior misconduct. "Evidence of other crimes, wrongs or acts of a person is admissible . . . to prove intent, iden-

The defendant's motive, intent and state of mind were relevant to the prosecution for the crimes of attempt to commit kidnapping in the second degree and risk of injury to a child. "Where, as here, there existed factual issues related to the defendant's intent, we recognize that such factual issues are characteristically proven by circumstantial evidence . . . . It is obvious that direct evidence of the accused's state of mind is rarely available and, therefore, intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Citation omitted; internal quotation marks omitted.) *State* v. *Hersey*, 78 Conn. App. 141, 166, 826 A.2d 1183, cert. denied, 266 Conn. 903, 832 A.2d 65 (2003); see also *State* v. *Jackson*, 257 Conn. 198, 210–11, 777 A.2d 591 (2001).

The issue with regard to the disputed evidence is twofold. We must determine if the court abused its discretion in determining, first, that the evidence was

tity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." Conn. Code Evid. § 4-5 (b). The record reflects that the state did not offer these items specifically as evidence of prior misconduct, but generally as evidence of the defendant's motive. At trial, the defendant discussed § 4-5, but argued that this evidence was not admissible as prior uncharged misconduct, and the court did not address the issue of admissibility on that ground. The court admitted these items solely on the ground that they had probative value relative to the issue of the defendant's motive and intent.

Although the defendant mischaracterizes the ground on which the court admitted this evidence, there is some merit to the defendant's claim that the *writings* were, in small part, evidence of prior uncharged crimes of the defendant. In the writings, the defendant wrote about at least one sexual relationship that he had engaged in with a boy in Florida. As the rule provides, the court could admit this evidence on the issue of motive. The court clearly indicated to counsel and to the jury that this evidence was to be considered solely on the issue of the defendant's motive. Accordingly, the court's admission of this evidence did not violate § 4-5, and we will address the defendant's claim that the court should have excluded the evidence as being irrelevant and unduly prejudicial.

relevant and, second, that the evidence need not be excluded because its probative value outweighed its prejudicial effect on the jury. "The challenged [e]vidence is relevant if it has a tendency to establish the existence of a material fact. . . . Relevant evidence is evidence that has a logical tendency to aid the trier [of fact] in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason . . . ." (Internal quotation marks omitted.) *State* v. *Nims*, 70 Conn. App. 378, 389, 797 A.2d 1174, cert. denied, 261 Conn. 920, 806 A.2d 1056 (2002); see Conn. Code Evid. § 4-1. Generally, relevant evidence is admissible unless an exclusionary principle applies. See Conn. Code Evid. § 4-2.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed

by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Peeler*, 267 Conn. 611, 637, 841 A.2d 181 (2004); see also Conn. Code Evid. § 4-3. Having set forth our standard of review and the applicable legal principles, we now turn to the evidence in question.

### A

First, the defendant challenges the admission of thirty-four pages of typewritten material authored by him. In these writings, reasonably viewed as the defendant's journal, the defendant detailed many of his dreams, beliefs and aspirations. The topics are varied, but a central theme in the journal is the defendant's desire to engage in sexual relationships with boys as young as four years old. The journal is replete with graphically detailed descriptions of sexual encounters between the defendant and young boys. The defendant portrayed some of these encounters as past events, others as dreams and others as something to which he aspired and would work to make a reality.[3]

The court did not abuse its discretion when it determined that the journal had probative value. The journal was compelling circumstantial evidence of the defendant's motive in approaching the victims in this case and in determining whether the defendant acted in the manner alleged by his victims and charged by the state. One of the central themes of the journal is, in itself, telling. This theme is the defendant's obsession with

---

[3] Having reviewed the journal in its entirety, we conclude that it would serve no useful purpose to set it forth in its entirety in this opinion.

gaining access to young boys for sexual purposes. In one representative excerpt, the defendant states: "The only problem is in the LITTLE BOYS. How am I going to get them?" Shortly thereafter, the defendant proclaims: "I can do it, and I will, somehow!" Throughout the journal, the defendant repeatedly discusses the difficulties inherent in obtaining young boys and the fact that satisfying his desires "demands an ingenious plan . . . ."

The defendant specifically discusses his goal of finding boys who are alone or who spend time with him at their parents' request. He also discusses coming upon young boys in public places and engaging in sexual activities with them. In one passage, the defendant writes about a sexual encounter with a young boy, who is not wearing a shirt, whom he found at a public beach. In yet another passage, the defendant describes seeing and being sexually attracted to "pretty wild bare chested little boys . . . ." The defendant describes his van, which he calls his "van sex temple." The defendant also writes about sexual encounters between himself and boys on the bed in his van. Further, the defendant writes about filming and photographing his sexual encounters with boys.

These written thoughts and desires are circumstantially relevant to the defendant's actions on October 16, 2000. Contrary to the defendant's assertions, the fact that he wrote extensively about his strong desire to "get" young boys and to engage in sexual activities with them was relevant to the jury's consideration of the charges against him. It was compelling evidence of why he acted as he did. Further, the journal depicts a state of mind that specifically relates to the facts and circumstances of this case. For example, in the journal, the defendant refers to his encountering boys who are the same age as one or more of the victims in this case and his strong sexual desire for such boys, the defendant's

desire to encounter boys alone in public places and to engage in sexual activities with them, the defendant's specific attraction to boys who are not wearing shirts and his desire to engage in sexual activities with them, as well as the defendant's desire to engage in sexual activities with boys on the bed in his van.

The defendant argues that the writings concerned a "taboo or disturbing" subject matter and improperly aroused the jury's emotions.[4] We agree with the defendant that this evidence was highly prejudicial to him. The court noted this prejudice, as well. The existence of such prejudice, however, is not dispositive. The issue is whether this evidence was *unduly* prejudicial or *improperly* aroused the jury's emotions. The fact that the writings depicted, in graphic detail, sexual encounters between the defendant and young boys, a topic that would have a tendency to arouse strong negative emotions, does not render the evidence inadmissible in light of its strong probative value on the issue of the defendant's state of mind. Furthermore, we are confident that the jury followed the court's timely and unambiguous instructions to consider this evidence solely in determining the defendant's motive and intent.[5]

[4] The defendant also argues that the writings were not probative because they reflected mere "dreams and fantasies" and "surely are not of logical thought." We disagree. Although some passages are written so as to memorialize what the defendant describes as dreams, the writings as a whole concern the same subject matter. The defendant intermingled his descriptions of dreams about sexual encounters with boys with writings about his conscious thoughts and desires about the same topic. As the court aptly noted, the defendant chose to memorialize these dreams concerning his sexual interactions with young boys in writing, and such conduct speaks to the defendant's state of mind. There is no reason to believe that the jury did not afford to excerpts concerning dreams the weight that it deemed proper.

[5] The court delivered an immediate limiting instruction concerning this evidence. The court stated: "[T]he evidence that has been introduced as having been seized from the defendant's van has been offered by the state and admitted by the court solely as evidence of the defendant's motive and intent in enticing the alleged victims to his van, if you find that he, in fact, did so. Such evidence has not been admitted or offered to prove that he, in fact, did try to entice the alleged victims to his van."

The defendant claims separately that the court improperly permitted the prosecutor to read aloud to the jury the defendant's journal. The record reflects that the prosecutor indicated at trial that he wanted to read aloud to the jury excerpts from the defendant's journal. The defendant objected on the ground that the writings were "prejudicial" and "that the evidence speaks for itself . . . ." The defendant also argued that there was a danger that, if the prosecutor were to read aloud only excerpts from the journal, the jury would improperly consider the passages read out of context or not review the journal in its entirety during its deliberations. The court ruled that the prosecutor could read aloud from the exhibit, provided that he read aloud the exhibit in its entirety. The court instructed the jury that it would have the full exhibit during deliberations and that it should keep the passages read "in context." The prosecutor then read aloud the journal, in its entirety, before the jury.

Apart from his claim that the court abused its discretion in admitting the journal into evidence, the defendant claims that permitting the prosecutor to read the journal aloud "highlighted the evidence and called undue attention to it." The defendant argues that "[g]iven the graphic nature of the [journal], having the pages read to the jury placed an unnecessary emphasis on the words contained therein and prejudiced the jury in making its deliberations."

During its charge on the risk of injury counts, the court again instructed the jury with regard to its proper role in considering this evidence. The court stated: "[T]he state is not claiming that the situation likely to be harmful to the victim's morals was exposure to those items or materials that were in the defendant's van. Rather, the state claims that being enticed to enter the defendant's van, given his intentions as evidenced by those items . . . constituted a situation likely to be harmful to their morals." With regard to the issue of motive generally, the court later stated: "Now, you have heard evidence regarding items and materials which were seized from the defendant's van. Those items, as I have previously instructed you, were admitted solely on the issue of the defendant's motive and intent."

The defendant does not cite to any authority for his proposition that the court should have precluded the prosecutor from reading aloud from a full exhibit, and we are unable to find any. We already have concluded that the court did not abuse its discretion in admitting these writings as a full exhibit, for the limited issue of the defendant's motive and intent. We likewise conclude that by permitting the prosecutor to use the exhibit as he did, the court did not abuse its "inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial." (Internal quotation marks omitted.) *State* v. *Holmes*, 64 Conn. App. 80, 85, 778 A.2d 253, cert. denied, 258 Conn. 911, 782 A.2d 1249 (2001).

B

The defendant next claims that the court improperly admitted the photographs seized from his van. The record reflects that the state introduced one exhibit, which consisted of approximately seventy-one separate photographs depicting boys in various poses, and another six exhibits, all of which consisted of photographs of nude boys. All of these photographs appear to have been downloaded from Internet web sites, and the defendant concedes in his brief that he printed these photographs from the Internet. Many of the images are in color and are printed on heavy paper. Most of the photographs contain Internet web addresses and some contain captions.[6]

Apart from the six photographs depicting nude boys, the other photographs depict boys in various poses and states of undress. The exhibit contains photographs of boys in their underwear, photographs of partially

---

[6] For example, one photograph contains the following caption: "Hi! This is my Boylove site! This site is for Boylovers and Boys! If you aren't a Boylover. Feel free to visit anyway! There might be something to learn!"

dressed boys reclining on beds or sofas, photographs of boys with their pants partially unzipped or pulled down, photographs of boys holding open their shirts, photographs of boys playing along a beach in their swimsuits, photographs that show only the clothed backside or crotches of boys and other photographs that show only boys' faces.

The defendant objected to the admission of these exhibits, arguing, as he does on appeal, that they lacked any probative value. The defendant argues that he did not take these photographs and that the photographs do not depict either the victims or the area in which the defendant was arrested. The defendant also argues that he did not illegally possess these photographs and that these photographs did not depict "lewd characterizations or sexual content." In contrast, however, the defendant simultaneously argues that the subject matter of these photographs was highly prejudicial. As the defendant admits, he does not contest "that the photographs . . . are not sexually explicit in any manner . . . ."

We conclude that the court's admission of these photographs reflected a sound exercise of discretion. The probative value of these photographs becomes obvious when the photographs are viewed in conjunction with the defendant's journal and the charges against him. The court admitted these exhibits into evidence solely on the issue of the defendant's motive and intent and so instructed the jury.[7] We already have concluded that the defendant's journal, replete with references to his sexual attraction to young boys, sheds light on his motive on October 16, 2000. These photographs also shed light on the defendant's motive. The fact that the defendant possessed more than seventy photographs of this nature, let alone the fact that they were in his

---

[7] See footnote 5.

van during the incident, corroborates the state of mind plainly described in the defendant's journal. That is, these photographs are further evidence of the obsession detailed in the journal and make it more likely that the defendant's conduct was motivated by his sexual attraction to young boys and his obsession with finding ways to engage in sexual activities with them.

Having discussed the probative value of these photographs, we also reject the defendant's claim that the court should have excluded these photographs because they "greatly" prejudiced the defendant. The defendant does not support his claim that these exhibits were of such a nature as to be unduly prejudicial. In fact, the defendant argues that these photographs are neither lewd nor sexually explicit. The jury was free to draw whatever reasonable inferences from this evidence, with regard to the defendant's motive, as it saw fit. This evidence may have been adverse to the defendant's case, but we do not conclude that it was *unduly* prejudicial to the defendant's case.

C

The defendant also claims that the court improperly admitted into evidence a portable lamp with a 250 watt bulb, a disposable 35mm camera that was still in its packaging, many sheets of stickers,[8] a metal badge engraved with the title, "Security Guard," and a pair of size eight underwear.[9] As explained previously, police seized all of these items from the defendant's van.

The defendant objected at trial to the admission of these items. He argues that these items lacked probative

---

[8] Some stickers depict, among other things, trucks, airplanes, boats, castles, unicorns, dragons, birds, whales, panda bears and the planet earth. Other stickers are packaged and labeled as "motivational stickers" and are captioned with phrases including "Enjoy life!" and "Do it now!"

[9] The jury reasonably could have found that the underwear is of a type typically worn by young boys.

value because there is no allegation that the defendant either used or threatened to use these items during the incident at issue and, therefore, that they are not relevant. The defendant further argues that these items "aroused the emotions of the jury."

We conclude that the court properly exercised its discretion in admitting these items into evidence solely on the issue of the defendant's motive.[10] We reiterate that motive is generally proven by circumstantial evidence. Police recovered each of these items from the defendant's van, and the evidence demonstrated that the defendant threatened to kill the victims if they did not get into the van. This fact, alone, confers on this evidence a degree of probative value. The fact that the defendant did not use any of these items during the incident does not lessen their probative value; the jury reasonably might have determined that the defendant did not use the items only because he lacked the opportunity to do so. The defendant urges us to view these items in artificial isolation, arguing that, on their own, none of these items reasonably sheds light on the defendant's motives. The court properly admitted these items because the jury reasonably could have determined that these items do shed light on the defendant's motives when they are viewed reasonably in light of the circumstances surrounding his arrest and the other evidence of his motive.

The jury reasonably could have determined that the lamp and camera are relevant in light of the defendant's desire, expressed in his journal, to photograph young boys engaging in sexual encounters with him. The badge and stickers reasonably could be viewed, as the state argues, as evidence of lures that the defendant might employ to attract young boys. The defendant argues that the state did not present any evidence with regard

---

[10] See footnote 5.

to the fact that he either used or might have been motivated to use these items as lures. Such evidence was not necessary. The jury need not have relied on opinion testimony to infer reasonably that the defendant, an adult, likely possessed these items because he intended to or desired to use them in connection with fulfilling his "plan" to engage in sexual relationships with boys. Likewise, the jury could have viewed the size eight underwear much as it might have viewed the photographs, given the other evidence in this case, as evidence of the defendant's sexual obsession with boys. Because of the charges in this case, as well as the age and gender of the victims, such evidence was relevant.

The defendant's arguments fail because the court is bound to view this evidence in the light that a rational juror might view it. "The jury is entitled to draw reasonable inferences from the evidence before it and, in performing its function, the jury brings to bear its common sense and experience in the affairs of life." *State* v. *Koslik*, 80 Conn. App. 746, 756, 837 A.2d 813, cert. denied, 268 Conn. 908, 845 A.2d 413 (2004). Expecting the jury to view these items in light of the other evidence presented, the court properly determined that it was relevant to the issue of the defendant's motive. Further, the defendant has failed to support his argument that the admission of these items was *unduly* prejudicial to him.

### III

Finally, the defendant claims that the court improperly denied his motion for a judgment of acquittal with regard to the risk of injury counts. We disagree.

"The standards by which we review claims of insufficient evidence are well established. When reviewing a sufficiency of the evidence claim, our courts apply a two-prong[ed] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Sec-

ond, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Feliciano*, 74 Conn. App. 391, 395, 812 A.2d 141 (2002), cert. denied, 262 Conn. 952, 817 A.2d 110 (2003).

We next define the elements that are integral to the crimes at issue. General Statutes (Rev. to 1999) § 53-21 (a), as amended by Public Acts 2000, No. 00-207, § 6, provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child . . . is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony." The charges against the defendant concern only that part of the statute that prohibits the creation of a situation likely to impair the morals of the victims.[11] The elements integral to the defendant's conviction under § 53-21 (a) (1) are as follows: (1) the defendant's conduct was wilful or unlawful; (2) the defendant created, acquiesced in or was deliberately indifferent to a situation that was likely to impair the victim's morals; and (3) the victim was younger than sixteen years of age. See, e.g., *State* v. *Dennis*, 150 Conn. 245, 250, 188 A.2d 65 (1963) (noting that statute precludes deliberate indifference to, acquiescence in or creation of situations inimical to minor's moral welfare); *State* v. *Payne*, 40 Conn. App. 1, 12–13, 669 A.2d 582 (1995), aff'd, 240 Conn. 766, 695 A.2d 525 (1997).

---

[11] In a long form information, the state charged, with regard to each of the minor victims, that the defendant "did willfully or unlawfully cause or permit a child under the age of sixteen years . . . to be placed in a situation that the morals of such child were likely to be impaired by engaging, enticing, and threatening the minor child in violation of Sec. 53-21 (a) (1) of the Connecticut General Statutes."

The defendant does not challenge the fact that the victims were younger than sixteen years of age. The defendant posits, as he did at trial, that the evidence demonstrated only that he threatened to kill the boys if they did not get into his van. The defendant argues that he "threatened [the] boys with bodily harm and nothing else" and that "[h]e did not utter anything suggestive or sexual, nor did he touch the children in any way."

Here, the state specifically charged that the defendant violated the statute by "engaging, enticing, and threatening" the boys. The jury had before it ample evidence of the defendant's motive and reasonably could have found that the defendant's motives during the incident were entirely sexual in nature. The jury reasonably could have found that the defendant had engaged, enticed and threatened the boys because he wanted to engage in the sexual behavior with them of the variety amply detailed in his journal. The jury reasonably could have found that the defendant acted unlawfully and wilfully in creating the situation that he did and that in so acting, the defendant created a situation that was likely to be harmful to the boys' morals.

The fact that the defendant did not *actually* impair the boys' morals is of no consequence. The jury, having heard the testimony of J and R, reasonably could have determined that *actual* impairment was averted by reason of the boys' actions and responses to the defendant's enticements and threats. What the statute precludes is the creation of a *situation* that is *likely* to impair the morals of a victim younger than sixteen years of age. "Lack of an actual injury to . . . the . . . morals of the victim is irrelevant . . . actual injury is not an element of the offense. . . . [T]he creation of a prohibited situation is sufficient." (Citation omitted; internal quotation marks omitted.) *State* v. *Davila*, 75 Conn. App. 432, 437, 816 A.2d 673, cert. denied, 264

Conn. 909, 826 A.2d 180 (2003); see also *State* v. *Cutro*, 37 Conn. App. 534, 541–42, 657 A.2d 239 (1995) (noting that violation of § 53-21 may occur even though victim is unaware of defendant's prohibited conduct).

Here, the situation that the defendant created rises to the level of behavior prohibited by the statute. The defendant engaged, enticed and threatened the minor victims. His explicit goal was to get them into his van, away from their parents or guardians. Probative evidence supported a finding that the defendant's conduct constituted steps toward sexual contact. The jury reasonably could have found that, once inside the van and away from their parents or guardians, the victims surely would have encountered strong sexual advances and behavior by the defendant. The defendant referred to his van as a "sex temple." He wrote about finding ways to engage in sexual activities with minors, including engaging in such behavior in his van, and graphically described the activities that he wanted to engage in with them. The defendant had a bed in his van, along with a camera and the other items previously described. The jury was entitled to view all of this evidence in light of its common sense and to draw reasonable inferences from this evidence concerning the defendant's motives. On the basis of the evidence, the jury reasonably could have found that the defendant had created a situation in which he could satisfy his sexual interest in boys and, specifically, these victims, and that he had taken every step possible to fulfill his desires in that regard.

In evaluating whether a situation is likely to impair a victim's morals, the relevant inquiry, as the court properly instructed the jury, is to evaluate the situation in light of "precepts that are commonly accepted among us as right and decent." See, e.g., *State* v. *Payne*, supra, 40 Conn. App. 13–14 (reiterating that "common sense of the community was an appropriate standard for a jury to apply in order to distinguish innocuous conduct

from conduct that would violate . . . § 53-21"). The evidence supported a finding that the defendant had created a situation in which he could satisfy the sexual interests described in his journal, interests that surpassed the deliberate touching of a minor's private parts, and included anal and oral intercourse. Consequently, the jury reasonably could have determined that the situation created was likely to have impaired the victims' morals.

For the foregoing reasons, we conclude that the court properly denied the defendant's motion for a judgment of acquittal. The state presented sufficient evidence to support the defendant's conviction with regard to these charges.

The judgment is affirmed.

In this opinion the other judges concurred.