# STATE OF CONNECTICUT *v.* JAMES W. CUMMINGS
## (AC 26288)

Schaller, Gruendel and Harper, Js.

Argued June 3—officially released October 4, 2005

*Glenn W. Falk*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, *Kevin J. Murphy*, senior assistant state's attorney, and *Herbert E. Carlson, Jr.*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, James W. Cummings, appeals from the judgment of conviction, rendered following a jury trial, of two counts of murder as an accessory in violation of General Statutes §§ 53a-54a (a) and 53a-8, two counts of attempt to commit murder as an accessory in violation of General Statutes §§ 53a-54a (a), 53a-8 and 53a-49 (a) (2), conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a), and conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48 (a).[1] The defendant claims that the trial court improperly (1) admitted into evidence his testimony from a probable cause hearing that took place during the trial of a coconspirator and (2) instructed the jury that the defendant could be found guilty as an accessory on the attempted murder counts. We affirm the judgment of the trial court.

[1] The court imposed a total effective sentence of seventy-five years imprisonment.

The jury reasonably could have found the following facts. In May, 1994, the defendant was the second highest ranking member of the New Britain chapter of the Los Solidos gang. The gang was comprised of chapters located throughout the state. The Hartford chapter, led by Jorge Rivera, exercised control over the other chapters in the state. Within each chapter there existed a hierarchical authority structure, known as a committee. The committee consisted of the chapter president, the vice president, warlords, stars and enforcers. The rest of the gang was comprised of soldiers and members. The New Britain chapter was led by Aramy Rivera, as its president, and the defendant, as its vice president. The defendant's duties in the gang included issuing orders to lower ranking members to carry out committee directives. The defendant, in his position of authority, typically instructed soldiers to perform "missions" to inflict bodily harm on others.[2] Gang members were bound to obey orders issued by the committee under penalty of violent retribution, including death.

By May, 1994, a hostile relationship, marked by violence and murder, existed between the Los Solidos gang and the Latin Kings gang. The gangs were both engaged in illegal drug related activity. In May, 1994, a member of the Los Solidos gang was murdered by Latin Kings members. That killing prompted Jorge Rivera, in his leadership capacity, to order retribution against the

[2] Juan Santiago, a member of the Los Solidos gang who participated in the events that underlie the defendant's conviction, testified for the state at trial. Santiago testified that the Los Solidos committee, which included the defendant, met frequently to discuss gang related problems that needed to be resolved. Santiago further testified that the committee planned "missions" to resolve disputes between members of the Los Solidos gang and others, including members of other gangs. Santiago explained that when the committee directed soldiers to perform missions against others, it directed them to inflict bodily harm on the intended victim or victims by means of fighting, stabbing or shooting. We use the word "mission" in this opinion solely in the manner in which it was defined and used by Santiago and others at trial.

Latin Kings. Specifically, Jorge Rivera ordered the New Britain committee to murder two Latin Kings members for every Los Solidos member killed at the hands of the Latin Kings. Aramy Rivera and the defendant encouraged Los Solidos members to be prepared to carry out this directive.

During the evening hours of May 14, 1994, Aramy Rivera and the defendant learned from other Los Solidos members about an incident that transpired earlier that evening between Los Solidos members and two Latin Kings members at a party in the Corbin Heights housing project in New Britain. They learned that the Latin Kings members had brandished firearms during a dispute and that the Latin Kings members were in the vicinity of the housing project where the dispute had occurred. Aramy Rivera and the defendant immediately began planning for Los Solidos members to retaliate with the use of firearms, a method of retaliation previously used by the gang. The defendant helped to select Los Solidos members to participate in the mission. The defendant instructed other gang members to obtain a stolen vehicle to use during the mission. The defendant provided gang members with clothing to wear and firearms to use during the mission. The defendant instructed Juan Santiago, the driver of the automobile used during the mission and the highest ranking Los Solidos member to participate in the mission, not to return unless someone, presumably a Latin Kings member, had been shot or killed.

The four Los Solidos members who had been selected for the mission, a group that included Santiago, Maurice Flanagan, Larry Gadlin and Derrence Delgado, drove to the area of New Britain where the Latin Kings members had been observed earlier that evening. Gadlin, who had been involved in the altercation with the two Latin Kings members earlier that evening, identified the two Latin Kings members traveling in an automobile

near the Corbin Heights housing project. Santiago drove the automobile carrying the Los Solidos members alongside the automobile carrying the two Latin Kings members as well as two other men. When the two automobiles were near a stop sign, Flanagan and Gadlin aimed their firearms out of the windows of their automobile and fired on the automobile carrying the Latin Kings. Flanagan and Gadlin later exited their automobile and fired on the Latin Kings' automobile as it drove away. The two Latin Kings members, Hector Rodriguez and Patrick Gannon, died as a result of the shooting. Another individual who was in the automobile, Walter Rodriguez, sustained various gunshot injuries. The fourth occupant of the vehicle, Reinaldo Mercado, did not sustain a gunshot injury.

I

The defendant first claims that the court improperly admitted into evidence his testimony from a probable cause hearing that took place during the trial of a coconspirator. We disagree.

During the defendant's trial, the prosecutor indicated that he wanted to introduce excerpts of a transcript, dated November 10, 1994, of the defendant's testimony during a probable cause hearing from a separate case. The probable cause hearing occurred in the Superior Court, and the proceeding was related to the state's prosecution of Flanagan and another individual, Thomas Mejia, for the November 4, 1993 murder of Latin Kings member Miguel DeJesus in New Britain.

The prosecutor identified the excerpts that he wanted to present to the jury and argued that the testimony was relevant and admissible on several grounds. First, the prosecutor argued that the testimony demonstrated that the defendant knew that Flanagan had shot and killed DeJesus. The prosecutor argued that this knowledge was relevant in proving that the defendant and

Flanagan were coconspirators in the present case, as well as the extent of the ends of their conspiracy. In this regard, the prosecutor argued that the evidence made it more likely than not that the defendant was aware of how Flanagan would use the firearms that he provided to him prior to the mission; it was relevant to the issue of whether Flanagan's conduct with the firearms was foreseeable. The prosecutor argued that the defendant's knowledge of Flanagan put the defendant "on notice that he has recruited a pretty good person to go out and make sure this killing [in the present case] happens." Second, the prosecutor argued that the testimony helped to demonstrate the existence of an ongoing war between the gangs that included the violent incident at issue in the present case. Third, the prosecutor argued that the testimony shed light on the defendant's prominent role in the Los Solidos hierarchy, as well as his authority over other gang members.

The defendant's attorney argued that the testimony was inadmissible on several grounds. First, she argued that the testimony was irrelevant because it concerned a matter that preceded the murders in the present case by approximately six months. Second, she argued that the prejudicial effect of the evidence outweighed its probative value. Third, to the extent that the prosecutor argued that the testimony demonstrated that the defendant likely foresaw that Flanagan would use the guns that the defendant had provided to Flanagan in the way that he did, the defendant's attorney claimed that this argument was legally unjustifiable. The defendant's attorney argued that the issue of foreseeability, in terms of the liability of coconspirators, concerns "whether actions of one coconspirator are foreseeable by another [coconspirator] based on the actions within the scope of the conspiracy and in furtherance of it." The defendant's attorney noted that the defendant was not charged in connection with DeJesus' death. She further argued that

any conspiracy that existed in that case was totally unrelated to a conspiracy that may have existed in the present case.

The court sustained the defendant's objection to one portion of the transcript excerpts offered by the prosecutor[3] and overruled the objection to the remainder of the evidence offered. The court ruled that the testimony constituted the admissions of the accused. The court rejected the defendant's argument that the evidence was inadmissible because it related to an event that preceded the time of the conspiracy alleged in the present case and related to a separate conspiracy. The court noted that the state bore the burden of proving that Flanagan's actions were reasonably foreseeable to the defendant in order for the defendant to be criminally liable as a coconspirator and ruled that this testimony was relevant to that end. Finally, the court ruled that the probative value of the evidence was not outweighed by its prejudicial effect. Specifically, the court noted that the excerpts it was admitting into evidence "[did] not implicate a role on the part of [the defendant] in the DeJesus murder . . . ."

The transcript excerpts admitted into evidence covered several topics. The defendant testified during the probable cause hearing that, at the time of that hearing, he had been a Los Solidos member for approximately three years and that, in November, 1993, he was the vice president of the New Britain chapter of the gang. The defendant testified that Aramy Rivera was the president and highest member of the chapter and that his position was second in rank. The defendant further explained that the warlord of the chapter was "the backbone of the family . . . the one who takes care

[3] The court ruled that the portion of the exhibit it disallowed had a tendency to implicate the defendant in DeJesus' murder and was, for that reason, more prejudicial than probative.

of all the missions of wartime." The defendant further testified that, in November, 1993, a state of war existed between the Los Solidos and Latin Kings gangs, a war over "respect." The defendant testified that the war was caused because the Latin Kings gang had been disrespectful to the Los Solidos gang.

The defendant also testified about a meeting that took place to "get everything organized" because of the state of war that existed. The defendant recalled that the gang needed to send members out "on missions" to conduct "shoot out[s]." He also testified that orders to "kill people" come from "Hartford" and that those orders go to the committee of the local chapter, which "just warns all the individuals, the soldiers."

Additionally, the defendant testified that, in November, 1993, he had known DeJesus for approximately one year and was aware that DeJesus had the position of "a corona" in the Latin Kings gang. The defendant identified Flanagan at the hearing. The defendant testified that he was present at a meeting with Flanagan the day after DeJesus was murdered. The defendant testified that Flanagan told him that he conducted surveillance of DeJesus, followed him to his high school, then walked up to him and shot him with a nine millimeter pistol. The defendant also testified that he was familiar with the automobile that Flanagan had used during the shooting.

On appeal, the defendant argues that the court improperly admitted the evidence because its probative value did not outweigh the degree of prejudice it created. The defendant contends that, because the November, 1993 shooting was similar in nature to the present crimes, the introduction of that evidence related to the shooting reflected the state's objective "to convict [him] on the basis of previous bad acts." Further, the defendant contends that the high degree of prejudice caused

by the evidence was not outweighed by the testimony's probative value. The defendant argues that this testimony "was neither necessary nor relevant to prove the case against [him] concerning the May 14, 1994 car shooting."

The issue with regard to the disputed evidence is twofold. We must determine if the court abused its discretion in determining, first, that the evidence was relevant and, second, that the evidence need not be excluded because its probative value outweighed its prejudicial effect on the jury. See *State* v. *Eastwood*, 83 Conn. App. 452, 464, 850 A.2d 234 (2004). "[E]vidence is relevant if it has a tendency to establish the existence of a material fact. . . . Relevant evidence is evidence that has a logical tendency to aid the trier [of fact] in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason . . . .

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . .

must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Citations omitted; internal quotation marks omitted.) Id., 465–66; see also Conn. Code Evid. §§ 4-2 and 4-3.

The state charged the defendant as an accessory to the murders of Hector Rodriguez and Gannon. The state also charged the defendant as an accessory to the attempted murders of Walter Rodriguez and Mercado. The court instructed the jury that it could find the defendant guilty of these crimes or, if it found that the defendant had entered into a conspiracy to commit murder, as charged, it could find the defendant vicariously liable for the crimes of murder and attempt to commit murder.

Our Supreme Court expressly adopted the doctrine of *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 2d 1489 (1946), in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993). Under that doctrine, "a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy." *State* v. *Walton*, supra, 43. The rationale of the doctrine is that "because the conspirator played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct." Id., 46.

The defendant's testimony at the probable cause hearing was relevant to the issue of whether Flanagan's criminal conduct on the night of May 14, 1994, was a reasonably foreseeable consequence of the conspiracy that existed between the defendant and Flanagan. The fact that the defendant knew that Flanagan, in fulfilling a gang mission, shot and killed a Latin Kings member in the manner that he did, just six months prior to the incident at issue in this case, certainly made it more probable that the defendant reasonably foresaw that Flanagan would fulfill his mission in a similar manner on May 14, 1994. The reasonableness of this evidentiary inference is supported by similarities between the shooting on November 4, 1993, and the shootings that occurred on May 14, 1994.

The evidence reasonably supported a finding that the defendant was aware that Flanagan, during a time of war between the Los Solidos and Latin Kings gangs, was sent on a gang sanctioned mission to shoot a Latin Kings member, DeJesus, on November 4, 1993. Flanagan followed DeJesus by automobile and, upon encountering DeJesus at a school, a Los Solidos member began to shoot at DeJesus from the automobile. Flanagan then walked up to DeJesus and shot him with a nine millimeter pistol.

The defendant correctly argues that Flanagan's criminal conduct on November 4, 1993, was not at issue in the present case. The defendant's role in that shooting was also not at issue in the present case. The defendant's testimony concerning his knowledge of the shooting was relevant, however, because it was extremely probative with regard to the issue of the foreseeability of Flanagan's criminal conduct during the mission on May 14, 1994. The evidence in the present case supported a finding that Flanagan and the defendant were coconspirators. The object of their conspiracy was to retaliate with deadly force against Latin

Kings members. The defendant helped Aramy Rivera select gang members, including Flanagan, who were appropriate for the mission. The defendant instructed others to obtain a stolen automobile to use during the mission, distributed clothing for members to wear during the mission and supplied gang members with firearms to use during the mission. The defendant supplied Flanagan with a nine millimeter pistol. We conclude that the defendant's knowledge that Flanagan had acted in the manner that he did on November 4, 1993, made it reasonably foreseeable to the defendant that Flanagan would also fulfill his mission against the Latin Kings on May 14, 1994, in the manner proven by the state. Accordingly, the defendant's testimony was relevant to the jury in determining the degree to which the state could impose criminal liability on the defendant for the criminal conduct of one of his coconspirators. The testimony shed light on the defendant's foreseeability of the consequences of the conspiracy, consequences that formed the basis of the charges against the defendant.

Having evaluated the relevancy of the disputed evidence, we next turn to the defendant's claim that the court should have excluded the evidence as being unduly prejudicial to him. The defendant's claim that the testimony permitted the state to convict him on the basis of prior bad acts or "to conflate" the November, 1993 shooting with the shootings at issue in the present case is not persuasive. The extensively redacted transcript of the defendant's testimony does not reflect that the defendant had any direct role in the DeJesus shooting. Insofar as the testimony reflected the defendant's role in the gang, such evidence was merely cumulative of evidence already before the jury. We conclude that the court's evidentiary ruling reflected a sound exercise of discretion.

## II

The defendant next challenges the court's instructions with regard to the attempted murder counts. The defendant claims that the court improperly instructed the jury with regard to the mental state required to convict him of attempt to commit murder as an accessory. The defendant also claims that, because the evidence did not permit a finding that he intended to kill Walter Rodriguez or Mercado, the court improperly instructed the jury that it could convict him as an accessory for the attempted murders of these victims.

In counts three and four of the substitute information, the state alleged that the defendant committed the crime of attempt to commit murder as an accessory against Walter Rodriguez and Mercado, respectively. At the close of the evidentiary phase of the trial, the defendant's attorney moved for a judgment of acquittal on these counts. The defendant's attorney argued that there was no evidence that the defendant had intended to kill Walter Rodriguez or Mercado. The defendant's attorney argued that the evidence only reflected that these individuals were innocent victims of a plan to kill Latin Kings members and that these individuals, who were not gang members, became victims of the mission that occurred during the evening hours of May 14, 1994, to the early morning hours of May 15, 1994, solely by means of their proximity to Hector Rodriguez and Gannon in the automobile fired on by the Los Solidos members. The defendant's attorney argued that the court should grant the motion for a judgment of acquittal on these counts because the law concerning attempted murder, unlike the law concerning murder, does not provide for transferred intent. He argued that, for an actor to be guilty of attempt to commit murder as an accessory, it must be found that the actor possessed the intent to murder the specific victim of the crime.

The court denied the motion for a judgment of acquittal with regard to these counts. The court acknowledged that the doctrine of transferred intent does not apply to attempted murder. The court determined, however, that the case did not present a situation that implicated the doctrine of transferred intent because the evidence "clearly" supported a finding that the defendant intended to kill "anyone and everyone" in the vehicle fired on by the Los Solidos members. The court later denied the defendant's request to instruct the jury that, with regard to the counts of attempt to commit murder as an accessory, the state bore the burden of proving that the defendant intended to kill particular, named, victims. The court also denied the defendant's request, in the alternative, to omit all instructions concerning the attempted murder counts.

The court instructed the jury that a person could be convicted as an accessory to a crime only if he acted as an accessory "with the same mental state required for the commission of the underlying crime and share[d] the same unlawful purpose or purposes in common with the person who actually commit[ted] that crime." The court instructed the jury that, with regard to the accessorial liability counts, which included the two counts of murder and the two counts of attempted murder, "the specific intent [is] to cause the death of another person." The court further instructed the jury that, to convict the defendant as an accessory on the counts of attempt to commit murder, the jury "must find that the state has proven beyond a reasonable doubt that he had the intent to commit the crimes charged, attempt to commit murder, that is, the intent to kill, and that he did intentionally aid another in the commission of those crimes or did provide another with a firearm to engage in conduct which constituted murder . . . ." The court explained to the jury that Hector Rodriguez and Mercado were the alleged victims

in the counts charging the defendant with attempt to commit murder.[4]

As stated in part I, the court also instructed the jury that it could impose criminal liability on the defendant under the *Pinkerton* doctrine for the crimes of murder and attempt to commit murder. The court instructed the jury that it could impose criminal liability on the defendant for the attempted murders of Walter Rodriguez and Mercado if it found that the defendant was part of a conspiracy to commit murder, that other members of the conspiracy attempted to murder these victims and that the attempted murder was within the scope of, in furtherance of and was reasonably foreseeable to the defendant as a necessary or natural consequence of the conspiracy.

The court, therefore, instructed the jury as to two methods of committing the crime of attempt to commit murder. The record does not reflect what theory of criminal liability the jury relied on when it convicted the defendant of attempt to commit murder; the jury delivered a general verdict. The defendant does not challenge his conviction for being a member of a conspiracy to commit murder, as alleged in count five of the substitute information. The defendant does not challenge, to any extent, the court's *Pinkerton* liability instructions or the sufficiency of the evidence to support his conviction as a coconspirator in the charges of attempt to commit murder.

---

[4] Insofar as the defendant claims that the court improperly instructed the jury with regard to the mental state required for the commission of the crime of attempt to commit murder as an accessory, we conclude that the claim is without merit. The basis of the nonevidentiary aspect of the defendant's instructional claim is that the court "fail[ed] to instruct the jury that the defendant had to have the intent to murder the specific victim of the attempt . . . ." We conclude that the court unambiguously conveyed to the jury that, to convict the defendant as an accessory to the attempted murders of Walter Rodriguez and Mercado, the state bore the burden of proving that the defendant intended to kill Walter Rodriguez and Mercado.

The central premise of the defendant's claim is that the court instructed the jury on a theory of liability, accessorial liability for attempt to commit murder, that is unsupported by the evidence. The defendant has a constitutional right "not to be convicted of a crime upon insufficient proof." (Internal quotation marks omitted.) *State* v. *Morgan*, 70 Conn. App. 255, 281, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002). We need not decide whether the evidence supported the defendant's conviction solely as an accessory on the charges of attempt to commit murder because the jury could have concluded that the evidence was sufficient to convict the defendant, under the *Pinkerton* doctrine, as a coconspirator on the charges of attempt to commit murder and convicted him on that basis.

Our Supreme Court has recognized that "a factual insufficiency regarding one statutory basis, which is accompanied by a general verdict of guilty that also covers another, factually supported basis, is not a federal due process violation." *State* v. *Chapman*, 229 Conn. 529, 539, 643 A.2d 1213 (1994) (en banc). Our Supreme Court, citing *Griffin* v. *United States*, 502 U.S. 46, 59–60, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991), noted: "It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." (Internal quotation marks omitted.) *State* v. *Chapman*, supra, 540.

The defendant does not claim that the evidence was insufficient to support his conviction as a coconspirator for the attempted murders of Walter Rodriguez and Mercado. We will not review the evidence in this regard in the absence of any properly presented claim that requires us to do so. Accordingly, we conclude that

there was at least one legal theory under which the jury could have found the defendant guilty if the jurors found beyond a reasonable doubt that evidence presented by the state proved the elements of the crime. See *State* v. *Anderson*, 86 Conn. App. 854, 863–64, 864 A.2d 35 (2004), cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005).

The judgment is affirmed.

In this opinion the other judges concurred.