## MICHAEL WALKER *v.* COMMISSIONER OF CORRECTION
### (AC 21458)

Lavery, C. J., and Dranginis and Freedman, Js.

Argued September 9—officially released November 19, 2002

*Damon A. R. Kirschbaum*, for the appellant (petitioner).

*Ronald G. Weller*, assistant state's attorney, with whom, on the brief, were *Timothy J. Liston*, state's attorney, and *George Ferko*, senior assistant state's attorney, for the appellee (respondent).

DRANGINIS, J. The petitioner, Michael Walker, appeals from the habeas court's dismissal of his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly found that his trial counsel's failure to impeach the testimony of Lee Baskerville, Terry Meade and Detective Joseph Marrero, and to present the testimony of Leon Allen and Rene Henry, did not constitute ineffective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). We affirm the judgment of the habeas court.

The following facts and procedural history are relevant to our resolution of the petitioner's appeal. In March, 1989, a jury, after twice deadlocking, convicted the petitioner of one count of murder in violation of General Statutes § 53a-54a in connection with an incident at a bar in Hartford.[1] He was sentenced to a total

[1] The details of the incident that led to the petitioner's conviction are set forth in *State* v. *Walker*, 33 Conn. App. 763, 764–66, 638 A.2d 1084, cert. denied, 229 Conn. 913, 642 A.2d 1209 (1994), as follows. "The victim, Sylvester Meade, was shot and killed outside the Blue Hills Cafe in Hartford. Four witnesses identified the [petitioner] as the person who shot the victim. Terry Meade, the victim's niece, testified that she saw the shooting while standing next to a car in front of the cafe, and saw the shooter run toward Adams Street in Hartford. She recognized the gunman as the [petitioner], but, because she was afraid of the [petitioner], did not immediately identify him to the police, and instead gave the police a deliberately inaccurate description of the shooter.

"Lee Baskerville testified that he saw the [petitioner], whom he had seen before, fire shots at the victim and then run toward Adams Street. Baskerville identified the [petitioner] as the gunman from a photographic array, and also identified the [petitioner] at trial.

"Geraldine Conners testified that she heard gun shots while in her first floor apartment at 1347 Albany Avenue. She looked out a window and saw, in a well lit area, someone running from Albany Avenue toward Adams Street. About one year later, Conners selected a photograph of the [petitioner] from a photographic array after viewing the array in her apartment. The following day, she again picked a photograph of the [petitioner] from a photographic array, and gave a written statement to the police. At trial, Conners was not able to identify the [petitioner].

"Diane Sims, Conner's daughter, testified that she heard gun shots while

effective term of sixty years in prison. After sentencing, the petitioner failed to file appellate papers in a timely

in her second floor apartment at 1347 Albany Avenue. She looked out a window, and saw someone running through a vacant lot toward Adams Street. About one year after the shooting, when her mother was being shown the photographic array in her apartment, Sims entered the bedroom where the photographs were laid out on the bed. At that time, she told the police that she had seen someone the night of the shooting. The police asked her to look at the array, and she selected a photograph of the [petitioner]. At trial, she was not able to identify the [petitioner].

"Three witnesses testified that the [petitioner] was not the shooter. Eddie Gant testified that he witnessed the shooting from a distance of twenty feet. He stated that the shooter had light skin and curly hair, and that he had never before seen the person. He also testified that he knew the [petitioner], and would have recognized him if he had been the gunman. Prior to his in-court testimony, Gant had told a police officer that he had not seen the shooting.

"Burness Wallace and Lillian Threet both testified that at the time of the shooting they were together in a car across the street from the victim's car, and that the gunman had light skin. They also testified that they knew the [petitioner], and that they were sure the [petitioner] was not the gunman. They both acknowledged that, although they knew that the [petitioner] had been charged with the crime, they did not go to the police with their account.

"At the time of the shooting, the [petitioner] was in the custody of the department of correction, and living in the Watkinson halfway house as part of a work release program. The halfway house is approximately one mile from the cafe. On the evening of the crime, which occurred between 12:45 and 1 a.m., the [petitioner] had left the house on an authorized furlough and was not there at 10 p.m., but was present at midnight and at 2 a.m. for facility head counts. The log indicated that the [petitioner] had also signed out at about 11 p.m., and had returned about twenty minutes later, although he failed to sign in.

"The [petitioner] was assigned to room twenty-six on the second floor of the house. The whereabouts of those assigned to the house were monitored, most notably by means of a head count at two hour intervals. In order to leave or enter the facility after midnight, a resident had to check in with a counselor. Windows on the first floor were locked, but windows on the second and third floors were not. Residents were not confined to their rooms at night.

"The facility had had security problems. First floor windows, which residents had access to, had been found unlocked, and other windows had been broken. A drainpipe that ran down from the room adjacent to the window of the [petitioner]'s room had been pulled away from the building. A counselor at the facility testified that a resident could get out of the facility undetected between midnight and 2 a.m. Another counselor testified that it was possible to get back into the facility undetected."

manner. On July 24, 1992, in accordance with a stipulated agreement, the court restored his appellate rights. Thereafter, this court affirmed the judgment of conviction in *State* v. *Walker*, 33 Conn. App. 763, 638 A.2d 1084, cert. denied, 229 Conn. 913, 642 A.2d 1209 (1994). Thereafter, the petitioner filed a third amended petition for a writ of habeas corpus, alleging ineffective assistance of trial counsel, denial of a fair trial in violation of his due process rights and actual innocence.[2] Following an evidentiary hearing, in which the court received extensive testimonial and documentary evidence, the court issued a thorough and well reasoned sixty-five page memorandum of decision denying the petition. The petitioner requested certification to appeal, which the court granted. He then filed the present appeal.

Before addressing each of the petitioner's claims of ineffective assistance of counsel, we begin our analysis with the appropriate standard of review. In a habeas appeal, the court "is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citation omitted.) *Duperry* v. *Solnit*, 261 Conn. 309, 335, 803 A.2d 287 (2002).

The standard to be applied by habeas courts in determining whether an attorney effectively represented a criminal defendant is set forth in *Strickland* v. *Washington*, supra, 466 U.S. 668, in which "the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective

---

[2] In his appeal to this court, the petitioner has abandoned his claims of actual innocence and denial of a fair trial. Thus, the only issue before this court is the petitioner's claim of ineffective assistance of counsel.

as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . .

"The first component of the *Strickland* test, generally referred to as the performance prong, requires that the petitioner show that counsel's representation fell below an objective standard of reasonableness. . . . In *Strickland*, the United States Supreme Court held that [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense, after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . .

"Even if a petitioner shows that counsel's performance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Therefore, [a] habeas court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if the claim may be disposed of on the ground of an insufficient showing of prejudice." (Citation omitted; internal quotation marks omitted.) *Doehrer* v. *Commissioner of Correction*, 68 Conn. App. 774, 777–79, 795 A.2d 548, cert. denied, 260 Conn. 924, 797 A.2d 520 (2002).

Here, the petitioner essentially claims that his attorney was ineffective for not eliciting testimony that the shooter was a light skinned male and that the petitioner would not have been convicted had such testimony been presented.[3] The strength of the evidence against the petitioner, however, belies his contention. In making his argument, the petitioner particularly challenges his trial counsel's failure to cross-examine and to impeach the credibility of Baskerville and Meade, key state's witnesses, with the inconsistencies between their testimony at trial and prior statements they gave regarding the physical description of the suspect. He insists that his attorney had ample court documents at his disposal to extensively cross-examine Baskerville and Meade, who had provided evidence connecting the petitioner to the crime, about their initial descriptions that the shooter had light skin, a skin tone that does not match the petitioner's dark complexion. In determining whether trial counsel should have cross-examined those two witnesses, the court noted that Baskerville and Meade had admitted at trial that they initially gave inaccurate descriptions of the shooter because they feared the petitioner. This court is satisfied that the evidence supports the habeas court's conclusion that it was a valid strategic decision for trial counsel not to

---

[3] By the time of the habeas hearing, the petitioner's trial counsel, attorney Daniel J. Hagearty, had died.

question Baskerville or Meade about their prior mis-statements because such cross-examination could have opened the door to testimony about their fear of the petitioner, especially where such testimony could have done more harm than good. Moreover, trial counsel elicited testimony from Baskerville that was consistent with the petitioner's alibi that he was at a halfway house at the time of the shooting. That testimony highlights yet another strategic reason for trial counsel not to have impeached Baskerville with the prior inconsistencies.

The petitioner further argues that trial counsel should have impeached Marrero's testimony that the descriptions of the shooter ranged "from one end of the spectrum to the other end of the spectrum" with the twelve statements that had been given to the police that all described the shooter as a light skinned Hispanic or black male. Given the fact that it is the absolute responsibility and right of the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their testimony; State v. Thompson, 69 Conn. App. 299, 317, 797 A.2d 539, cert. granted on other grounds, 260 Conn. 936, 802 A.2d 90 (2002); we agree with the court that the jury was free to accept or to reject the numerous descriptions provided during trial that the shooter was light skinned, particularly in light of the fact that the jury had the opportunity to view the petitioner. Accordingly, we agree with the court's conclusion that additional evidence regarding the shooter's light skin complexion would not have had a significant impact on the jury's decision.

The petitioner also faults his trial counsel for not calling two witnesses, Allen and Henry, whose testimony, he argues, could have provided exculpatory information. Specifically, the petitioner argues that because Allen and Henry were in the bar when the shooting took place they would have testified that the shooter was a light skinned Hispanic or a black male.

On the basis of that supposed testimony, the petitioner maintains that it would have been possible for the jury to conclude that he was not the shooter. In his principal brief, the petitioner incorrectly states that the habeas court did not rule on that argument. The court, in fact, concluded that trial counsel's failure to call those witnesses did not prejudice the petitioner because the "jury heard numerous descriptions of the shooter and still convicted the [petitioner]." Additionally, during the trial, counsel called three eyewitnesses to rebut the testimony of the state's witnesses. All three of the petitioner's witnesses testified that they knew the petitioner and stated that he was not the shooter. Rather, the shooter, according to those witnesses, was a light skinned male who they had never before seen. We agree with the habeas court that trial counsel's decision not to have Allen and Henry testify on the petitioner's behalf was based on his reasonable belief that their testimony would have elicited needless cumulative evidence.

After a careful review of the record and after applying the appropriate standard of review, we conclude that the petitioner has failed to demonstrate that the habeas court's factual findings are clearly erroneous. The record reveals that trial counsel was a competent attorney who made certain strategic or tactical decisions in defending the petitioner that were reasonable and logical under the circumstances of the case. We therefore conclude that the petitioner has failed to satisfy his burden of establishing that his trial counsel's performance fell below an objective standard of reasonableness or that there was a reasonable probability that but for trial counsel's allegedly deficient performance, the result would have been different.

The judgment is affirmed.

In this opinion the other judges concurred.