# ERIC FLOYD *v.* COMMISSIONER OF CORRECTION
## (AC 26567)

Schaller, DiPentima and Lavine, Js.

Argued October 17, 2006—officially released February 13, 2007

*Diane Polan,* with whom, on the brief, was *Mary Anne Royle,* for the appellant (petitioner).

*Frederick W. Fawcett,* supervisory assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Gerard P. Eisenman,* senior assistant state's attorney, for the appellee (respondent).

*Opinion*

LAVINE, J. The petitioner, Eric Floyd, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the court improperly concluded that he failed to prove (1) that he had received ineffective assistance of counsel and (2) that the state had suppressed exculpatory evidence in violation of *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In addition, he asserts that the state knowingly used perjured testimony to obtain his conviction. We affirm the judgment of the habeas court.

The relevant facts and procedural history are set forth by our Supreme Court in its decision affirming the petitioner's conviction on direct appeal. *State* v. *Floyd,* 253 Conn. 700, 756 A.2d 799 (2000). "In the very early morning on January 21, 1994, Alex Delgado and the victim, Jose Avellanet, were walking on Clinton Avenue in Bridgeport when they were approached by the [petitioner], who held what appeared to be a nine millimeter gun. Delgado had known the [petitioner] for several years. . . . Delgado became aware of the presence of another person, whom he did not recognize . . . . Delgado . . . asked the [petitioner] and the unidentified

person to let him and the victim leave. The [petitioner] then fired his gun three or four times at the ground near Delgado's feet. . . . The [petitioner] took Delgado's money and jewelry, and the unidentified person took the victim's money.

"Shortly thereafter, the [petitioner] called out the name 'Mickey,' and two men, who were farther up Clinton Avenue and whom Delgado could not identify, started running down the street toward Delgado and the others. At that point, Delgado turned and ran in the opposite direction. As he was running, he heard three or four gunshots flying and ricocheting around him. Delgado also heard the [petitioner] shouting at him . . . . Delgado ran around a corner and, at that point, could no longer see the [petitioner] or the victim. Two other eyewitnesses, however, saw the [petitioner] and Mickey [Lopez] fire multiple gunshots at the victim as he lay on the ground, after Delgado ran away.

"Later that morning . . . paramedics . . . found the victim lying on the ground and observed that he had sustained multiple gunshot wounds. . . . A subsequent autopsy revealed three gunshot wounds, one of which actually caused the victim's death and another of which potentially was fatal. *The medical examiner recovered a nine millimeter bullet from the victim's body.* The police recovered four spent nine millimeter cartridge casings, two spent .45 caliber casings and two .45 caliber bullets from the crime scene. . . . [A] criminalist with the Connecticut State Police Forensic Science Laboratory, specializing in the examination of firearms, testified that he believed that the bullets and casings were fired from at least four different weapons. . . .

"[T]he [petitioner] subsequently was charged with the murder of the victim in violation of [General Statutes] § 53a-54a (a), the attempted murder of Delgado in violation of General Statutes §§ 53a-49 and 53a-54a

(a), commission of a class A, B or C felony with a firearm in violation of [General Statutes] § 53-202k, and criminal possession of a firearm in violation of [General Statutes] § 53a-217. At the conclusion of the trial, the jury [returned] a verdict of guilty of the crimes of murder, commission of a class A, B or C felony with a firearm, and criminal possession of a firearm . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Floyd*, supra, 253 Conn. 703–705.

Following his unsuccessful appeal, the petitioner filed an amended petition for a writ of habeas corpus. In that petition, he first claimed that his trial counsel, Paul Martin Tymniak, provided ineffective assistance because he failed to investigate, to raise and to develop adequately a third party culpability defense. Tymniak was deceased at the time of the habeas proceeding. At the hearing, the petitioner presented attorney Norman A. Pattis as an expert witness on the level of competency required of a defense attorney. The petitioner's second claim in his petition was that the state failed to disclose exculpatory information in violation of its obligation under *Brady*. The court rejected both of the claims but later granted the petition for certification to appeal. Additional facts will be set forth as necessary.

I

The petitioner first claims that the court improperly concluded that his trial counsel rendered effective assistance. The petitioner argues that Tymniak failed to investigate, to develop and to pursue adequately a third party culpability defense when he received information suggesting that other individuals were involved in the shooting. We are not persuaded.

"Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they

are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Griffin* v. *Commissioner of Correction*, 97 Conn. App. 200, 202, 903 A.2d 273, cert. denied, 280 Conn. 922, 908 A.2d 543 (2006).

"In *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 798, 837 A.2d 849, cert. denied, 268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004).

It is well established that we "need not determine the deficiency of counsel's performance if consideration of the prejudice prong will be dispositive of the ineffectiveness claim." *Griffin* v. *Commissioner of Correction*, 98 Conn. App. 361, 366, 909 A.2d 60 (2006). To prevail on the prejudice prong, the petitioner must demonstrate that "counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." (Internal quotation marks omitted.) Id.

In the present case, the court denied the petition because the petitioner failed to meet his burden of proving the prejudice prong of *Strickland*. It reasoned: "[T]here is no question that the three witnesses [to the crime, Delgado, Reginald Berry and Michael Younger], who identified the petitioner as the shooter of the victim, were severely damaging to the petitioner's case. The jury apparently believed them, and with this eyewitness testimony, despite any alleged errors on the part of attorney Tymniak, testimony of these three eyewitnesses would have been sufficient for conviction and, therefore, the petitioner has not sustained his burden of proving that if it were not for the ineffectiveness of trial counsel, there is a reasonable probability that the outcome of the trial would have been different."

At the habeas hearing, the petitioner alleged that he was prejudiced by Tymniak's failure to investigate adequately the possibility that other individuals had been responsible for the shooting, following the disclosure of certain documents prior to trial. Specifically, he claims that Tymniak should have investigated (1) the statement made by an informant that two individuals associated with a gang, "Ito" and "Alex," were involved in the shooting, and (2) the statement made by Luis Troncoso that a man in a yellow house across the street had identified the shooters as "Jimmy" and "Jeff." Moreover, the petitioner argues that he was prejudiced by Tymniak's failure to call two witnesses at the trial, Jesus Davila, who would have testified that Delgado had implicated two different individuals in the murder, and "Mickey," who was identified as a participant in the murder by Younger and the victim's brother, Auggie Avellanet. As stated, however, by the court: "There is no evidence that [the petitioner] could have located any of these witnesses and, if he had, whether they would

have talked to him. These individuals were other drug dealers, some of them members of [a] gang, and it is highly unlikely that they would have given him any worthwhile information."

The jury found the petitioner guilty after hearing testimony from three eyewitnesses who identified him as the shooter. Delgado indicated that the petitioner had a nine millimeter gun. Evidence presented at trial revealed that a nine millimeter bullet was found in the victim's body. The petitioner's argument that he established prejudice through the testimony of his expert witness is unpersuasive.[1] We agree with the court that the petitioner's counsel could not have presented Troncoso to testify that "Jimmy" and "Jeff" were the shooters because the information would have been inadmissible hearsay. Moreover, we agree that Lopez and anyone else who was implicated in the shooting would have been advised by any competent attorney not to testify pursuant to their rights under the fifth amendment.

"The burden to demonstrate what benefit additional investigation would have revealed is on the petitioner." *Holley* v. *Commissioner of Correction*, 62 Conn. App. 170, 175, 774 A.2d 148 (2001). "Mere conjecture and speculation are not enough to support a showing of prejudice." *Burke* v. *Commissioner of Correction*, 90 Conn. App. 370, 378, 877 A.2d 885, cert. denied, 275 Conn. 926, 883 A.2d 1241 (2005). Because the petitioner failed to prove that the witnesses were available to testify at trial, what they would have testified about or that their testimony would have had a favorable impact on the outcome of the trial, we agree with the court that his claim of ineffective assistance must fail. See,

---

[1] Although Pattis testified that the defense of third party culpability was available in this case, he conceded that "it's a very difficult defense" and that he could not say that had it been presented, the results would have been different.

e.g., *Ostolaza* v. *Warden*, 26 Conn. App. 758, 766–67, 603 A.2d 768, cert. denied, 222 Conn. 906, 608 A.2d 692 (1992); *Henry* v. *Commissioner of Correction*, 60 Conn. App. 313, 321, 759 A.2d 118 (2000).[2]

## II

The petitioner next argues that the court improperly dismissed his claim that the state suppressed exculpatory information in violation of his right to due process of law under *Brady* v. *Maryland*, supra, 373 U.S. 87. Specifically, he claims that the state's failure to disclose the second page of a report prepared by Sergeant Joseph Sherbo of the Bridgeport police department and its late disclosure of the sworn statements of Troncoso and Younger, when taken cumulatively, prevented Tymniak from adequately investigating and developing a third party culpability defense. We are not persuaded.

"In [*Brady* v. *Maryland*, supra, 373 U.S. 83] . . . the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the

---

[2] The petitioner also claims for the first time on appeal that the court's denial of the habeas petition was improper given Tymniak's failure to turn over his file to appellate counsel when requested. Because the petitioner never distinctly raised this claim to the habeas court, and, therefore, the court did not address it, we decline to afford it review. See *Kelley* v. *Commissioner of Correction*, 90 Conn. App. 329, 335, 876 A.2d 600 ("[t]his court is not bound to consider claimed errors unless it appears on the record that the question was distinctly raised . . . and was ruled upon and decided by the court adversely to the appellant's claim"), cert. denied, 276 Conn. 909, 886 A.2d 423 (2005).

Moreover, the petitioner also states in the facts section of his brief that Tymniak was ineffective for failing to raise an alibi defense. He fails to present any legal argument or case law to support his contention. We decline to address this claim as "[a]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *State* v. *Abraham*, 84 Conn. App. 551, 561, 854 A.2d 89, cert. denied, 271 Conn. 938, 861 A.2d 514 (2004).

good faith or bad faith of the prosecution. To establish a *Brady* violation, the [petitioner] must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the [petitioner], and (3) it was material [either to guilt or to punishment]. . . .

"It is well established that [e]vidence known to the [petitioner] or his counsel, or that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*. . . . Furthermore, we have stated: *Brady* does not mandate pretrial disclosure in all cases. . . . Where there has been an initial disclosure of exculpatory evidence at trial, the appropriate standard to be applied is whether the disclosure came so late as to prevent the [petitioner] from receiving a fair trial. . . . The [petitioner] bears the burden of proving that he was prejudiced by the failure of the state to make the disclosure earlier." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 81 Conn. App. 264, 277–78, 839 A.2d 622, cert. denied, 268 Conn. 915, 847 A.2d 312 (2004).

Whether the evidence was disclosed in sufficient time for the petitioner to have used it effectively at trial was a factual determination for the habeas court. See *State* v. *Stinson*, 33 Conn. App. 116, 120, 633 A.2d 728 (1993).

In the present case, the court determined that the petitioner did not meet his burden with regard to any of the three statements. "[T]he court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous." (Internal quotation marks omitted.) *Walker* v. *Commissioner of Correction*, 73 Conn. App. 629, 632, 809 A.2d 521 (2002), cert. denied, 262 Conn. 943, 815 A.2d 677 (2003). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and

firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *State* v. *Warren*, 77 Conn. App. 564, 568, 824 A.2d 849, cert. denied, 265 Conn. 907, 831 A.2d 253 (2003). "The habeas court judge, as trier of the facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Internal quotation marks omitted.) *Edwards* v. *Commissioner of Correction*, 88 Conn. App. 169, 173, 868 A.2d 125, cert. denied, 273 Conn. 941, 875 A.2d 43 (2005). We examine each of the court's findings in turn.

At the habeas proceeding, the petitioner claimed that the second page of Sherbo's report, petitioner's exhibit eleven, was suppressed.[3] The court found that the report in its entirety "was not suppressed and was made available to the defense at an appropriate time and, therefore, was not a *Brady* violation." The court stated that it reached this factual determination after hearing testimony from Sherbo and the trial prosecutor, senior assistant state's attorney C. Robert Satti, Jr., that all eight pages of the report, identified by both witnesses as respondent's exhibit B, were made available to Tymniak during the trial in 1995. The court credited the testimony of Sherbo and Satti after examining the transcript of Tymniak's cross-examination of Sherbo regarding his report during the trial and comparing the petitioner's exhibit eleven with the respondent's exhibit B.

Moreover, the court determined that "the report contains double and triple hearsay, and there is nothing in that page that proves that attorney Tymniak could have

---

[3] The second page of the Sherbo report contains the following: "Also interviewed was Auggie Avellanet brother of the victim. He told the undersigned that Jesus told him that Delgado said that Joel and Mickey did the shooting, Auggie also believes that Jesus knows more [than] what he is telling. . . ." Specifically, the petitioner contends that the page was omitted from the hearing in probable cause discovery package and that he did not receive it until two years after the appeal pursuant to a freedom of information request from the Bridgeport police department.

found out any information as to third party culpability if he had investigated the comments made in petitioner's exhibit eleven. It is pure speculation to believe that Delgado would have stated this information in court or that . . . Davila would have given up any information. They might well have exercised their fifth amendment rights. Certainly, if Joel or Mickey could have been identified, they would hardly have admitted to the shooting. It should also be noted that there was no evidence regarding the availability of these witnesses. . . . [I]t is speculation as to what benefit [the page] would have been to the petitioner at his criminal trial." On the basis of our review of the record, the court's memorandum of decision and the exhibits, we are not left with the definite and firm conviction that a mistake has been committed. The court's finding regarding the second page of the Sherbo report is not clearly erroneous.

With respect to Troncoso's statement, the court found that that it "clearly" had not been suppressed because the state disclosed a summary of the statement on May 24, 1994, before the hearing in probable cause, and disclosed the actual statement nearly three weeks prior to trial. The petitioner asserts that the court's conclusion was improper because the actual statement included additional information that was not contained in the summary report. Specifically, Troncoso stated that "Jimmy" and "Jeff," the two individuals mentioned in the summary of the statement, were members of a gang and that Jimmy "hangs out at 42 Clinton Street."

The court's finding that the state had not suppressed the Troncoso information is not clearly erroneous. The state disclosed the information to Tymniak prior to trial. He chose not to seek a continuance to investigate further the man purported to have been living in the yellow house or the "Jimmy" or "Jeff" mentioned by

Troncoso in the statement. The petitioner failed to present any evidence that Troncoso or any of the witnesses referred to in the statement were available to testify at the original trial. See *Ostolaza* v. *Warden*, supra, 26 Conn. App. 766. Moreover, the habeas court heard testimony from Satti that the information given by Troncoso may not have concerned the homicide of the victim in this case but other homicides on the same street that occurred at about the same time.[4]

We last address the Younger statement.[5] The court found that the state had disclosed the police report containing the statement to the petitioner's counsel at the time of trial following Younger's testimony in accordance with the rule of practice then in effect.[6] The petitioner claims that the state should have disclosed the statement earlier because [Younger's] description of the shooting was "strikingly different" from the testimony given by the other two eyewitnesses to the crime, Delgado and Berry, and, therefore, constituted exculpatory impeachment evidence.

On the basis of our review of the record, we conclude that the versions of the shooting from all three witnesses are essentially consistent, the only significant difference being that Berry recanted his statement at trial and that it was admitted under *State* v. *Whelan*,

---

[4] A comparison of the Troncoso statement with the version of events as testified to by Younger and Berry reveals inconsistencies. Moreover, Troncoso's statement refers to a person who was shot in the legs, whereas Avellanet's autopsy does not mention gunshot wounds to the legs.

[5] Younger stated: "I was upstairs in my house and I heard someone yell out Fuji stop him and then I heard a shot. I got up and looked out the window and I saw a guy running towards Railroad Avenue and I saw another guy being told to get on the ground. . . . I seen Mikie and several others run up to the guy while he was on the ground. Mikie started shooting. This person name E came over and started shooting too. Both Mikie and E were shooting at the guy." He also indicated that no one else fired gunshots at the person on the ground other than Mikie and E and that Berry had seen the incident occur.

[6] The parties stipulated to the disclosure date during the habeas trial.

200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[7] Accordingly, the court's finding that the petitioner failed to prove that he was prejudiced by the timing of the state's disclosure of Younger's statement is not clearly erroneous.

## III

Finally, we consider the petitioner's claim that the state knowingly used false testimony to obtain his conviction. Specifically, the petitioner argues that the state knowingly withheld from him and the jury information that Younger had been granted favorable consideration from the state in exchange for his testimony. In support of his claim, the petitioner asserts that the state improperly vouched for Younger's credibility in its closing argument, effectively bolstering Younger's testimony that he had not received favorable consideration in exchange for his testimony.[8] We disagree in light of our Supreme Court's previous resolution of the consideration issue on direct appeal; see State v. Floyd, supra, 253 Conn. 739–40.

In its memorandum of decision, the habeas court stated that "Michael Younger . . . had criminal charges pending [against him] in the judicial district of

[7] All three witnesses identified the petitioner as a shooter. Younger placed the same individuals at the scene of the crime as did Berry and Delgado, the only addition being that he stated that someone yelled out, "Fuji, stop him." He did not implicate Fuji as one of the shooters. These witnesses consistently maintained at trial that there was more than one shooter, and the forensic evidence indicated that there may have been up to four. See State v. Floyd, supra, 253 Conn. 704.

[8] The state maintains that the issue of whether the state knowingly used perjured testimony to obtain the conviction is not reviewable on appeal because the petitioner did not allege it in his amended petition or in his posttrial brief. We review this claim, however, as the petitioner bases his argument on the state's vouching for Younger's credibility during closing argument, a ground that was both alleged in the amended petition and addressed by the habeas court in the memorandum of decision, albeit in the context of the discussion of the petitioner's Brady claims.

Fairfield at the time that he testified against the petitioner at the petitioner's criminal trial. The petitioner had requested an evidentiary hearing to determine whether a plea agreement between the state and Younger has been disclosed to the trial court and to defense counsel before Younger had testified. . . . [Our] Supreme Court ordered the trial court to hold an evidentiary hearing to determine whether Younger and the state had a plea agreement when Younger testified at trial. [The trial court, *Gormley*, *J.*] conducted such a hearing and held that there was not an undisclosed, implied agreement between Younger and the state. [Our] Supreme Court stated in *State* v. *Floyd*, [supra, 253 Conn. 739–40] in pertinent part as follows: 'We conclude that the trial court reasonably could have found, based on the evidence presented, that there was no implied plea agreement between Younger and the state. . . . Accordingly, we conclude that the trial court's factual finding that there was no such implied agreement must stand.' " Quoting further from the Supreme Court decision in *State* v. *Floyd*, supra, 745–46, the trial court stated: " '[T]he jury reasonably could have inferred from Younger's testimony that, even though he did not have a specific deal with the state and did not know of any past consideration for his testimony, his pending charges provided a motivation for him to testify favorably for the state. Indeed, in closing arguments, defense counsel urged the jury to make that very inference. . . . Furthermore, the trial court instructed the jury that it could consider whether Younger was expecting favorable treatment from the state in the case pending against him in deciding whether Younger had any bias, interest or motive to testify falsely.' "

We agree with the petitioner who, quoting *State* v. *Goodson*, 84 Conn. App. 786, 803, 856 A.2d 1012, cert. denied, 271 Conn. 941, 861 A.2d 515 (2004), stated that " '[t]he knowing presentation of false evidence by the

state is incompatible with the rudimentary demands of justice. . . . A new trial is required if the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" Our Supreme Court, however, affirmed the factual finding that there was no plea agreement between Younger and the state. The prosecutor's remarks in closing argument therefore were not based on false testimony, as the petitioner claims. Consequently, the petitioner's claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.