# WILLIAM EASTWOOD *v.* COMMISSIONER OF CORRECTION
## (AC 29357)

Flynn, C. J., and DiPentima and Arnold, Js.

Argued January 14—officially released May 19, 2009

*Michael Zariphes*, special public defender, for the appellant (petitioner).

*Lisa A. Riggione*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, *Linda N. Howe*, senior assistant state's attorney, and *Linda F. Currie-Zeffiro*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

ARNOLD, J. The petitioner, William Eastwood, appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal, the petitioner argues that the court improperly concluded that his defense counsel was not ineffective in representing him at trial. We affirm the judgment of the habeas court.

The following facts and procedural history are necessary for the resolution of the petitioner's appeal. The petitioner was convicted, following a jury trial, of three counts of attempt to commit kidnapping in the second degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-94 (a), three counts of risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (a) (1), as amended by Public Acts 2000, No. 00-207, § 6, and one count of interfering with an officer in violation of General Statutes § 53a-167a. The petitioner was sentenced to a total effective term of nine years imprisonment, to be followed by fifteen years of special parole. Thereafter, the petitioner filed a direct appeal, claiming that the trial court improperly (1) denied his motion to suppress items that the police seized from his van, (2) admitted these items into evidence and (3) denied his motion for a judgment of acquittal with regard to the risk of injury counts. This court affirmed the judgment of conviction. *State* v. *Eastwood*, 83 Conn. App. 452, 454, 850 A.2d 234 (2004), cert. denied, 286 Conn. 914, 945 A.2d 978 (2008).

In the petitioner's direct appeal, this court determined that the jury reasonably could have found the following facts. "During the afternoon hours of October 16, 2000, the [petitioner] drove in his van to Liberty Street in New Haven. He parked his van near a multifamily house where ten year old J, eleven year old R and twelve year old N, who are brothers, resided with their family. In the early evening hours, after the boys had returned home from school, R and N walked to a nearby market to purchase snacks. J received a quarter from his uncle and began walking toward the market to join his brothers. J was not wearing a shirt.

"The [petitioner], who was sitting in the driver's seat of his van with the driver's window rolled down, observed J walking alone toward the market. The [petitioner] called to J, saying, 'little boy . . . come here,

come here.' J declined. The [petitioner] then said to J, 'come in this van,' and indicated that he wanted to take him to Madison. When J again refused to approach, the [petitioner] said, 'when I take you, you're not going to tell your parents.' The [petitioner] told J, 'don't make me come out of this van and grab you and kill you; you ain't gonna see your parents again.' The [petitioner] then opened the driver's door of his van and stepped out. The [petitioner] threatened to kill J if he did not get into the van. J smelled alcohol on the [petitioner's] breath, observed the [petitioner] drinking from a square shaped bottle and observed through a window a mattress in the back of the van.

"Frightened by the [petitioner], J ran to the market and told his brothers about his encounter with the [petitioner]. Shortly thereafter, the three brothers left the market together. They soon encountered the [petitioner], who called to them. The [petitioner] had spoken with R shortly before, asking him to go with him in his van. The [petitioner] now asked the boys, as a group, to accompany him to Madison. J left the scene to get his uncle, who lived in his house. The [petitioner] again asked R and N to get into the van so he could 'take them somewhere.' The [petitioner] threatened to kill R and N if they did not get into the van. The [petitioner] told R that he was not a stranger and that he was not dangerous. R refused to get into the van, telling the [petitioner], among other things, to leave him alone and that he was a stranger.

"J summoned his uncle, telling him that 'there is a guy that wants to take me to Madison; if I don't get in the car, he is going to kill me.' The victims' uncle immediately walked to the van and asked the [petitioner] what he wanted. The uncle had never met the [petitioner] before and believed that the [petitioner] was intoxicated. The [petitioner] asked the uncle if he could take the boys to Madison. The uncle strongly

refused, instructed his nephews to go back inside their house and dialed 911 on his cordless telephone.

"The [petitioner], watching the boys' home, remained in his van until Gregory Catania, a New Haven police officer, arrived. The [petitioner] disobeyed Catania's commands to exit the van. Catania opened the driver's door of the van, pulled the [petitioner] out of the van and attempted to handcuff the [petitioner]. The [petitioner] resisted. A second police officer, Rosealee Reid, arrived and assisted Catania in handcuffing the [petitioner] and placing him in the back of Catania's police cruiser. Catania placed the [petitioner] under arrest." Id., 454–56.

After his conviction and subsequent direct appeal, the petitioner filed an amended petition for a writ of habeas corpus on November 27, 2006, specifying various ways in which his trial counsel was ineffective. A trial was held on April 26, 2007. On October 19, 2007, the court denied the petition, finding that the petitioner had failed to satisfy his burden of proving ineffective assistance of counsel. The court subsequently granted the petition for certification to appeal to this court, and this appeal followed.

On appeal, the petitioner argues that his trial counsel was ineffective in that he failed (1) to investigate properly and to secure and to present evidence regarding the closed position and inoperability of the driver's side window of the petitioner's van after having been apprised fully of this information by the petitioner prior to trial, (2) to consult with and to put forth an expert witness at trial to help illustrate to the court and jury alternative theories and distinctions between dreams and fantasy and the motive and intent to commit the crimes charged, and (3) to advise the petitioner meaningfully as to sentence review and to file the petitioner's application for sentence review after he had signed the

application and delivered it to trial counsel. We disagree with the petitioner and, accordingly, affirm the judgment of the habeas court.

Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Citation omitted; internal quotation marks omitted.) *Henderson* v. *Commissioner of Correction*, 80 Conn. App. 499, 503, 835 A.2d 1036 (2003), cert. denied, 267 Conn. 918, 841 A.2d 1190 (2004).

"In *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Internal quotation marks omitted.) *Nieves* v. *Commissioner of Correction*, 92 Conn. App. 534, 536, 885 A.2d 1268 (2005), cert. denied, 277 Conn. 903, 891 A.2d 2 (2006).

"The first part of the *Strickland* analysis requires the petitioner to establish that . . . counsel's representation fell below an objective standard of reasonableness

considering all of the circumstances. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." (Internal quotation marks omitted.) *Bova* v. *Commissioner of Correction*, 95 Conn. App. 129, 135, 894 A.2d 1067, cert. denied, 278 Conn. 920, 901 A.2d 43 (2006). "Turning to the prejudice component of the *Strickland* test, [i]t is not enough for the [petitioner] to show that the errors [made by counsel] had some conceivable effect on the outcome of the proceeding. . . . Rather, [the petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (Internal quotation marks omitted.) Id. With these principles in mind, we now address each of the petitioner's claims in turn.

I

The petitioner first claims that his trial counsel failed to undertake an investigation after the petitioner told him that the driver's side window of the van was closed and not able to be opened. We do not agree.

The following additional facts are necessary to resolve the petitioner's claim. At the petitioner's underlying criminal trial, J testified that the petitioner was sitting in the driver's seat in the van during the incident in question and that the window was down. J also testified that when the petitioner opened the van door, the light came on inside the van, and he was able to see inside. R testified that the petitioner manually opened the window on the driver's side when the petitioner spoke to him. The victims' uncle testified that when he approached the van, the petitioner was sitting in the

driver's seat. The uncle testified that the window and the door were closed, but the petitioner opened the door when he approached. Catania testified that he was a patrol officer on the night in question and responded to this incident, and that when he got to the van, the door was shut and the window was up.

The petitioner testified at the habeas trial that the centerpiece of the state's case was that his alleged threat to the youngest boy, J, was made through the open window on the driver's side of the petitioner's van. Trial counsel acknowledged at the habeas trial that he, in fact, did inspect the van, which had been impounded by the police, but he could not recall if he checked to verify whether or not the driver's side window was inoperable and in a closed position. Trial counsel testified that in his opinion, whether the window was inoperable was a minor issue. There was evidence that the van door also was open, which tended to prove the witnesses' ability to see inside the van and to hear the petitioner's conversation.

Trial counsel made a tactical decision to impeach the testimony of R that the petitioner manually rolled down the window, rather than utilize information that the window was inoperable. He did so by showing that the window was controlled electronically and, thus, could not be operated manually. In addition, as the habeas court noted, trial counsel cross-examined witnesses regarding discrepancies in their testimony regarding the window and emphasized those discrepancies during his closing argument to the jury. The jury, therefore, was presented with substantial impeachment evidence as a result of counsel's cross-examination of the witnesses. "[T]here is a strong presumption that the trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment . . . ." (Citation omitted.) *Iovieno* v. *Commissioner of Correction*, 67 Conn. App. 126, 128, 786

A.2d 1113 (2001), cert. denied, 259 Conn. 916, 792 A.2d 851 (2002). The petitioner has not rebutted sufficiently the strong presumption that trial counsel's strategy was reasonable in his cross-examination of the witnesses with regard to the window.

Furthermore, the petitioner has the burden of showing what benefit additional investigation of the window would have revealed or what benefit a different line of impeachment would have achieved. The petitioner failed to carry his burden of showing that there is a reasonable probability that the outcome of the trial would have been different in light of the strong and overwhelming evidence presented by the state.[1] "Mere conjecture and speculation are not enough to support a showing of prejudice." (Internal quotation marks omitted.) *Floyd* v. *Commissioner of Correction*, 99 Conn. App. 526, 532, 914 A.2d 1049, cert. denied, 282 Conn. 905, 920 A.2d 308 (2007). The petitioner thus has failed to meet his burden under both prongs of the *Strickland* standard.

## II

The petitioner's second claim is that his trial counsel failed to consult with and to put forth an expert witness at trial to help illustrate to the court and jury alternative theories and distinctions between dreams and fantasy and the motive and intent to commit the crimes charged.

In the trial court, the petitioner had challenged the admission of thirty-four pages of typewritten materials that he authored. First, the petitioner had filed a motion

---

[1] There was sufficient compelling evidence that the petitioner was obsessed with the goal of engaging in sexual acts and relationships with young boys. Items seized from the petitioner's van included a security guard badge, a camera and lighting equipment, a pair of boys underwear, photographs of partially clothed or nude boys, and pages from a journal detailing his past experiences, dreams, fantasies and future goals involving sexual acts with young boys. See *State* v. *Eastwood*, supra, 83 Conn. App. 458–59.

to suppress the evidence for lack of probable cause in support of the search warrant. The court denied the motion to suppress. See *State* v. *Eastwood*, supra, 83 Conn. App. 456–63. The petitioner next challenged the admissibility of this evidence. On direct appeal, this court found that "[t]he journal was compelling circumstantial evidence of the [petitioner's] motive in approaching the victims in this case and in determining whether the [petitioner] acted in the manner alleged by his victims and charged by the state." Id., 466. A central theme in the journal was the petitioner's desire to engage in sexual relationships with young boys. "The journal is replete with graphically detailed descriptions of sexual encounters between the [petitioner] and young boys. The [petitioner] portrayed some of these encounters as past events, others as dreams and others as something to which he aspired and would work to make a reality." Id.

At the habeas trial, the petitioner argued that his trial counsel was ineffective because he failed to call an expert during his trial to testify as to the difference between dreams and fantasies and the intent to commit the crimes with which the petitioner was charged. The petitioner called Kenneth M. Selig, a psychiatrist, who described the difference between a "dream" and a "fantasy." Selig testified that dreams are an unconscious process usually occurring during REM sleep, and fantasies are conscious thoughts that represent desires, wishes or undesirable thoughts.[2] Selig further testified

---

[2] Selig testified as follows: "A dream is an unconscious process that typically occurs during REM sleep and represents a variety of possible issues that have psychological relevance to the dreamer. These could include the playing out of conflicts. They can include the expression of wishes. They can include some disguise manifestations of other emotional or mental issues that the dreamer may have."

Selig further testified: "[F]antasy is not exactly a technical psychiatric term. Fantasy as it's used by laypeople generally implies conscious thoughts that represent desires or wishes that one may have or nonreality kinds of thinking that may or may not be desirable. There can be fantasies which would be thoughts about an undesired reality. For example, the fantasies

that there was no automatic connection between dreams and fantasies and the motive to do a particular act. The petitioner then called Michael Blanchard, an attorney, to testify as an expert in the area of criminal law. Blanchard testified that the journal writings would be a significant issue at the petitioner's trial and would have a profound effect on the jury. Therefore, it would have been appropriate for trial counsel to utilize an expert witness to interpret the journal writings for the jury properly. The habeas court weighed this testimony and found that the understanding of dreams and fantasies was within the common knowledge of jurors and that the jury did not require expert testimony to help distinguish them from the required showing of intent by the state. We agree with the habeas court. See *State* v. *Padua*, 273 Conn. 138, 149, 869 A.2d 192 (2005) (expert testimony required only when question goes beyond field of ordinary knowledge and experience of trier of fact).

Regarding Blanchard's testimony that trial counsel should have utilized an expert witness to distinguish dreams and fantasies from motive and intent, "[t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." *State* v. *Talton*, 197 Conn. 280, 297, 497 A.2d 35 (1985); see *Adorno* v. *Commissioner of Correction*, 66 Conn. App. 179, 186, 783 A.2d 1202, cert. denied, 258 Conn. 943, 786 A.2d 428 (2001). The court properly found that trial counsel was not deficient in failing to call an expert

of someone who is depressed could be very morose and very despondent kinds fantasies. So, the notion of fantasies would be thinking that is not reality but rather represents some emotional or other kind of need or feeling that the person doing the fantasizing might have. People could fantasize about their being very wealthy. They could fantasize about their death. So, it's thinking about a whole variety of things, but it's not—but it's like going on in the conscious mind, not actually being played out in reality."

to distinguish dreams and fantasies from motive and intent because the petitioner's expert failed to establish that such testimony would have assisted the petitioner at trial. In this regard we note that although Selig testified that there was no automatic connection between dreams and fantasies and the motive to do a particular act, he also testified that when a person memorializes his dreams and intermingles those memorializations with conscious desires, those writings, in fact, could be indicative of motive and intent.

Psychiatric testimony at trial carried with it the danger of highlighting and emphasizing the disturbing contents of the journal writings. Instead, trial counsel relied on argument to the jury that the petitioner had no control over the subject of his dreams and that they should not be considered in determining motive and intent. Trial counsel's decision enjoys a strong presumption that it was a matter of sound trial strategy, and the petitioner has not overcome this presumption. See *Bova v. Commissioner of Correction*, supra, 95 Conn. App. 137–38. The journal writings were cumulative of other compelling evidence of motive and intent, including eyewitness testimony and the many items seized from the petitioner's van. Even if counsel's failure to present an expert witness in the field of psychiatry was deemed to be deficient, there was more than sufficient evidence of the petitioner's guilt for the jury to consider. It is not reasonably probable that the outcome of the trial would have been different had the petitioner presented an expert on this topic.

III

The petitioner's final claim is that his trial counsel rendered ineffective assistance when he failed to advise the petitioner meaningfully as to sentence review and to file the petitioner's application for sentence review

under General Statutes § 51-195,[3] after he had signed the application and delivered it to counsel for filing.

The petitioner testified at his habeas trial that he was distressed from the trial proceedings, and, although he was unsure of exactly what he signed, he thought that trial counsel would take care of it. Trial counsel testified that he did not file the application for sentence review because he had discussed the matter with the petitioner and had advised the petitioner that if the petitioner chose to exercise his right to sentence review, there was a potential that he could receive an increased sentence. Trial counsel considered the sentence imposed on the petitioner to be fair, given the facts of the case, and, because the petitioner did not want to receive an increased sentence, the petitioner ultimately decided not to proceed with the application for sentence review.

[3] General Statutes § 51-195 provides: "Any person sentenced on one or more counts of an information to a term of imprisonment for which the total sentence of all such counts amounts to confinement for three years or more, may, within thirty days from the date such sentence was imposed or if the offender received a suspended sentence with a maximum confinement of three years or more, within thirty days of revocation of such suspended sentence, except in any case in which a different sentence could not have been imposed or in any case in which the sentence or commitment imposed resulted from the court's acceptance of a plea agreement or in any case in which the sentence imposed was for a lesser term than was proposed in a plea agreement, file with the clerk of the court for the judicial district in which the judgment was rendered an application for review of the sentence by the review division. Upon imposition of sentence or at the time of revocation of such suspended sentence, the clerk shall give written notice to the person sentenced of his right to make such a request. Such notice shall include a statement that review of the sentence may result in decrease or increase of the term within the limits fixed by law. A form for making such application shall accompany the notice. The clerk shall forthwith transmit such application to the review division and shall notify the judge who imposed the sentence. Such judge may transmit to the review division a statement of his reasons for imposing the sentence, and shall transmit such a statement within seven days if requested to do so by the review division. The filing of an application for review shall not stay the execution of the sentence."

The habeas court found that trial counsel had advised the petitioner that if he applied for sentence review, he could receive an increased sentence, and, following this consultation, the petitioner opted not to pursue sentence review. The court found that under these circumstances, trial counsel did not render ineffective assistance. The habeas court heard the testimony of the petitioner and trial counsel and credited the testimony of trial counsel that the petitioner decided not to pursue sentence review. "The court, in its role as finder of fact, was the sole arbiter of the credibility of the witnesses and the weight to afford their testimony." *Batts* v. *Commissioner of Correction*, 85 Conn. App. 723, 728, 858 A.2d 856, cert. denied, 272 Conn. 907, 863 A.2d 697 (2004). This court does not "second-guess findings related to the credibility of witnesses." Id.

The judgment is affirmed.

In this opinion the other judges concurred.